UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

F.C., on behalf of herself and her child, T.C.,

                        Plaintiff,

             -v-

NEW YORK CITY DEPARTMENT OF EDUCATION;
NEW YORK CITY BOARD OF EDUCATION;
CARMEN FARIÑA, in her official capacity as Chancellor
of the New York City School District,

                     Defendants.

------------------------------------------------------------------------X

15 Civ. 6045 (PAE)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/5/16

PAUL A. ENGELMAYER, District Judge:

      Plaintiff F.C., individually and on behalf of her minor son, T.C., ("plaintiff"), brings this

action against the New York City Department of Education ("DOE"), the New York City Board

of Education ("BOE"), and Carmen Fariña, in her official capacity as Chancellor of the New

York City School District (collectively, "defendants"), under the Individuals with Disabilities

Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, the Due Process Clause and

the Equal Protection Clause of the 14th Amendment to the U.S. Constitution, 42 U.S.C. § 1983,

Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. §§ 794, the New York

State Constitution, New York State Education Law §§ 3202, 3203, and 4401 *et seq.*, and 8

N.Y.C.R.R. §§ 100 *et seq.* and 200 *et seq.*

      Now pending is defendants' motion to dismiss, in part, plaintiff's Amended Complaint

("AC") under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  The AC

brings a range of claims.  One set appeals certain administrative rulings by a New York City

impartial hearing office ("IHO") and the New York State Review Officer ("SRO") pertaining to

a due process complaint F.C. filed regarding T.C.'s schooling during the 2011–2012 and 2012–2013 school years ("SYs").  Defendants do not move to dismiss these claims.  But defendants do move to dismiss plaintiff's other claims.  These include claims raised before but not addressed by the IHO and SRO; claims related to later school years, including that defendants violated T.C.'s rights while the IHO and SRO decisions were pending and continued to do so thereafter; claims that defendants failed to implement the relief awarded by the IHO and SRO; and claims challenging defendants' systemic policies and practices.

For the reasons that follow, defendants' motion to dismiss is granted in part and denied in part.

## I.      Background

### A.      Factual Background[1]

T.C., who was age 11 when the AC was filed, is a "child with a disability" under the IDEA and an individual with a disability under Section 504 under the Rehabilitation Act.  AC ¶ 12.  T.C. has delays in writing, reading, and basic math skills, and has learning disabilities, Attention Deficit Hyperactivity Disorder ("ADHD"), and a language-based disability.  *Id.* ¶¶ 82, 112, 120, 128–136, 199–200.  F.C. and T.C. live together in Community School District 2 in Manhattan, New York.  *Id.* ¶¶ 13–14.  Until June 2015, T.C. attended public elementary school in District 2; in September 2015, T.C. began attending public middle school.  *See id.* ¶¶ 55, 72, 91, 119, 198.

T.C. received early intervention and preschool special education services.  *Id.* ¶ 68.  While T.C. was in kindergarten, the DOE created an Individualized Education Program ("IEP")

---

[1] These facts are drawn from the Amended Complaint.  Dkt. 20 ("AC").  For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

2

for the 2010–2011 SY ("2010 IEP").  *Id.* ¶ 70.  The 2010 IEP terminated all of T.C.'s special education services and declassified T.C.  *Id.* ¶ 71.

In May 2011, defendants held an IEP meeting, and in November 2011, provided F.C. with the IEP for the 2011–2012 SY (second grade) ("2011 IEP").  *Id.* ¶¶ 85, 94.  The 2011 IEP recommended counseling, speech language therapy ("SLT"), and occupational therapy ("OT") in small groups of two or three children.  *Id.* ¶ 95.

In May 2012, defendants held an IEP meeting for the 2012–2013 SY (third grade), at which T.C. was decertified for all services except for OT.  *Id.* ¶¶ 107–08.

On May 24, 2013, F.C. filed a due process complaint, which was later amended on June 24, 2013 ("the DPC").  It alleged, *inter alia*, that the DOE had failed to provide T.C. with a free appropriate public education ("FAPE") for the 2011–2012 and 2012–2013 SYs.  *Id.* ¶¶ 6, 124. The IHO issued an interim order directing defendants to fund various independent educational evaluations ("IEEs").  *Id.* ¶ 127; *id.*, Ex. C ("Interim Order").  These evaluations were later conducted.  AC ¶¶ 128–40.

On March 10, 2014, the IHO issued a decision (the "IHD").  It found, *inter alia*, that the DOE had failed to provide T.C. with a FAPE for the 2011–2012 and 2012–2013 SYs, and awarded T.C. compensatory education.  *Id.* ¶¶ 7, 156–59; *id.*, Ex. A ("IHD").  On April 18, 2014, F.C. filed a petition to the SRO appealing only the rulings of the IHD adverse to T.C. (*i.e.*, awarding less compensatory education than F.C. had sought) and the IHD's failure to rule on certain issues.  *Id.* ¶ 164.  Defendants did not cross-appeal the IHD.  *Id.* ¶ 166.

Defendants did not convene an IEP meeting, or prepare an IEP, for the 2013–2014 SY. *Id.* ¶ 165.  In May 2014, defendants held an IEP meeting for the 2014–2015 SY.  *Id.* ¶¶ 174–77.

F.C. later discovered that defendants had decertified T.C. at the May 2014 IEP meeting. *Id.* ¶ 180. During the 2014–2015 SY, T.C. did not receive any services. *Id.* ¶ 182.

On March 31, 2015, the SRO issued a decision upholding the IHD. *Id.* ¶ 9; *id.*, Ex. B ("SRO decision"). After the SRO's decision, F.C. filed another due process complaint alleging that T.C. had been denied a FAPE for the 2013–2014 and 2014–2015 SYs. AC ¶ 190.

In September 2015, T.C. began middle school without an IEP. *Id.* ¶ 198.[2]

### B.    Overview of the Amended Complaint

The AC challenges as unlawful a host of actions and omissions by, and policies and practices of, defendants, which it alleges were implicated by defendants' treatment of T.C. By way of broad overview:

First, F.C. challenges the scheduling of special education and related services and compensatory education services. F.C. alleges that T.C.'s IEP resulted in T.C.'s receiving such services during the school day, which resulted in T.C.'s being removed from his classes, without receiving make-up instruction to cover the course material that T.C. missed. *See id.* ¶¶ 96 (2011), 171–72 (spring 2014). Plaintiff alleges that defendants had a policy and practice of not offering such services at other times. *Id.* ¶¶ 59–60, 96, 172, 206; *see also id.* ¶ 238 (appealing IHD insofar as it required T.C. to miss instructional time in core classes to receive certain compensatory education).

Second, F.C. challenges limitations on the special education services that the IEP teams were able to recommend for him. F.C. alleges that some services were unavailable, *see, e.g.*, *id.* ¶¶ 88, 111 (IEP team did not recommend and was not familiar with assistive technology

---

[2] In her motion to dismiss briefing, plaintiff represented that she would be filing a third due process complaint for the 2015–2016 SY. Dkt. 32, at 8.

("AT")); that the amount of individualized care T.C. received was restricted, *see, e.g.*, *id.* ¶¶ 112–13 (2012 IEP did not offer one-on-one ("1:1") instruction or after-school tutoring); that the IEP, per DOE policy, would not provide services to enable T.C. to participate in extracurricular activities, *id.* ¶ 62; and that services were not available for children with ADHD, *id.* ¶¶ 63, 207, 246–47.

Third, F.C. challenges defendants' decertifications of T.C. for special education services without first conducting an appropriate reevaluation.[3]  F.C. complains that T.C. was decertified multiple times.  *See id.* ¶¶ 71 (2010 IEP declassified T.C. and terminated all special education services), 102–08 (2012 IEP decertified T.C. for all services except for OT, based on evaluation of non-licensed speech pathologist), 180, 193–97 (2014 IEP meeting decertified T.C. without reevaluation).  F.C. alleges that defendants have asserted that they cannot reverse the 2014 decertification decision.  *Id.* ¶ 202.  F.C. challenges defendants' alleged practice of not reevaluating students before decertifying them, and their alleged failure to properly train or supervise employees as to reevaluations.  *See id.* ¶¶ 64–65, 194; *see also id.* ¶ 195 (defendants represented at administrative hearing that reevaluation not required prior to declassification).

Fourth, F.C. challenges T.C.'s IEPs for lowering, relative to the general school population, the criteria necessary for T.C. to be promoted to the next grade, rather than giving him services that would enable him to meet the generally applicable criteria.  *See id.* ¶¶ 97, 277.

## C.   Procedural History

On July 31, 2015, plaintiff commenced this action by filing a complaint.  Dkt. 1.  On October 29, 2015, defendants filed a motion to dismiss.  Dkt. 12.  On November 23, 2015, plaintiff filed the AC.  Dkt. 20.  On December 17, 2015, defendants filed a motion to dismiss the

---

[3] For ease of reference, the Court refers generally to both decertification and declassification as "decertification," unless referring to specific acts taken by defendants with respect to T.C.

AC, Dkt. 25, along with a memorandum of law, Dkt. 26 ("Def. Br."), and declaration with attached exhibits in support, Dkt. 27 ("Hassan Decl."). On January 12, 2016, plaintiff filed a memorandum of law in opposition to defendants' motion, Dkt. 32 ("Pl. Br."), and the following day filed a declaration with attached exhibits, Dkt. 33 ("Hyman Decl."). On January 25, 2016, defendants filed a reply memorandum. Dkt. 34 ("Def. Reply Br.").

## II. Discussion

Defendants move to dismiss all claims in the AC except to the extent that F.C. appeals specific adverse rulings by the IHO and SRO as to the 2011–2012 and 2012–2013 SYs. *See* Def. Br. 13–14. Defendants argue that the Court lacks subject matter jurisdiction over all claims pertaining to T.C.'s education after the 2012–2013 SY, whether brought under the IDEA or other laws, because F.C. failed to exhaust administrative remedies for those years. Defendants argue that the Court similarly lacks jurisdiction over plaintiff's § 504 claims for the 2011–2012 and 2012–2013 SYs because F.C. failed to exhaust administrative remedies as to those specific claims. Defendants also argue that, because they have conceded that they did not offer T.C. a FAPE between 2011 and 2015, to the extent that F.C.'s claims are read to claim denial of a FAPE, F.C.'s claims are moot and there is no case or controversy. Finally, defendants argue as to various specific claims that the AC does not state a claim.

After setting out the standards of review, the Court first addresses defendants' challenges to subject matter jurisdiction, and then defendants' argument that the AC does not state a claim.

### A. Standards of Review

#### 1. 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction

has the burden of proving by a preponderance of the evidence that it exists." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks and citation omitted). "The court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Id.* (internal quotation marks and citations omitted). Additionally, the Court may properly refer to matter outside the pleadings when considering the existence of jurisdiction on a motion pursuant to Rule 12(b)(1). *Makarova*, 201 F.3d at 113.

### 2.     12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)) (internal quotation marks omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. "[R]ather, the complaint's *factual* allegations must be enough to raise a right to relief above the speculative

level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110,

120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks, citation,

and alteration omitted) (emphasis in *Arista Records*).

### B.    Failure to Exhaust

#### 1.    Legal Framework

The IDEA requires a state that receives federal education funding to provide all children

with disabilities with a "free appropriate public education."  20 U.S.C. § 1412(a)(1)(A); *see also*

*Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005).  A FAPE should

"emphasize[] special education and related services designed to meet [a disabled child's] unique

needs and prepare [the child] for further education, employment, and independent living."  20

U.S.C. § 1400(d)(1)(A).  To accomplish that purpose, the DOE must develop an IEP for each

disabled child—which "must be reviewed, and where necessary, revised at least once a year"—

that "sets out the child's present educational performance, establishes annual and short-term

objectives for improvements in that performance, and describes the specially designed

instruction and services that will enable the child to meet those objectives."  *Honig v. Doe*, 484

U.S. 305, 311 (1988); *see also* 20 U.S.C. § 1414(d)(1)(A); *T.Y. v. N.Y.C. Dep't of Educ.*, 584

F.3d 412, 415 (2d Cir. 2009).  The IEP must be "reasonably calculated to enable the child to

receive educational benefits."  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester*

*Cty. v. Rowley*, 458 U.S. 176, 207 (1982); *see also Gagliardo v. Arlington Cent. Sch. Dist.*, 489

F.3d 105, 107 (2d Cir. 2007) (quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122

(2d Cir. 1998)).  It must provide an "appropriate education, not one that provides everything that

might be thought desirable by loving parents."  *Bryant v. N.Y. Educ. Dep't*, 692 F.3d 202, 215

(2d Cir. 2012) (quoting *Walczak*, 142 F.3d at 132) (internal quotation marks omitted).

When a parent believes that the state has failed to offer his or her child a FAPE, the parent may file a due process complaint that challenges the appropriateness of the IEP and attend a hearing before an IHO.  20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1).  A party aggrieved by an IHO's decision may appeal to an SRO.  20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2).  An appeal from the decision of an SRO may be brought as a civil action in federal or state court.  20 U.S.C. § 1415(i)(2)(A); N.Y Educ. Law § 4404(3).

"It is well settled that the IDEA requires an aggrieved party to exhaust all administrative remedies before bringing a civil action in federal or state court . . . ."  *J.S. v. Attica Cent. Sch.*, 386 F.3d 107, 112 (2d Cir. 2004).  The Second Circuit has repeatedly held "that the IDEA's exhaustion requirement is jurisdictional."  *Coleman v. Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 203 (2d Cir. 2007) (citing *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 483 (2d Cir. 2002), and *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 199 (2d Cir. 2002)); *see also Cave v. East Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir. 2008).[4]

The exhaustion requirement applies to "potential plaintiffs with grievances related to the education of disabled children . . . even if their claims are formulated under a statute other than

---

[4] Although the characterization of the exhaustion requirement as jurisdictional or as a mandatory claims-processing rule (or affirmative defense) subject to waiver has been a matter of debate following various Supreme Court decisions addressing the distinction in other areas, in the absence of a Second Circuit decision overturning binding precedent, the Court is bound to treat these issues as jurisdictional.  *See Coleman*, 503 F.3d at 203–04; *see also Baldessarre v. Monroe-Woodbury Cent. Sch. Dist.*, 820 F. Supp. 2d 490, 502 n.13 (S.D.N.Y. 2011), *aff'd*, 496 F. App'x 131 (2d Cir. 2012) (summary order).  Nothing turns on this distinction here, because, in any event, defendants clearly contest plaintiff's exhaustion of administrative remedies, so "there can be no claim of waiver or forfeiture here."  *Coleman*, 503 F.3d at 204.

the IDEA (such as the [Americans with Disabilities Act] or the Rehabilitation Act)." *Polera*,

288 F.3d at 481.  The IDEA provides:

> Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under . . . other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under [the IDEA], the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under [the IDEA].

20 U.S.C. § 1415(*l*).

"'[R]elief that is also available' under the IDEA has been broadly construed 'to mean

relief for the events, condition, or consequences of which the person complains, not necessarily

relief of the kind the person prefers.'"  *Baldessarre v. Monroe-Woodbury Cent. Sch. Dist.*, 820 F.

Supp. 2d 490, 502–03 (S.D.N.Y. 2011) (quoting *Polera*, 288 F.3d at 483, 488) (internal

quotation marks omitted), *aff'd*, 496 F. App'x 131 (2d Cir. 2012) (summary order).  As the

Second Circuit has explained:

> Exhaustion of administrative remedies is required under the IDEA so that disputes related to the education of disabled children are first analyzed by administrators with expertise in the area who can promptly resolve grievances.  Exhaustion of the administrative process allows for the exercise of discretion and educational expertise by state and local agencies, affords full exploration of technical educational issues, furthers development of a complete factual record, and promotes judicial efficiency by giving these agencies the first opportunity to correct shortcomings in their educational programs for disabled children.  If the administrative process is not successful at resolving the dispute, it will at least have produced a helpful record because administrators versed in the relevant issues were able to probe and illuminate those issues for the federal court.

*J.S.*, 386 F.3d at 112–13 (citations and internal quotation marks omitted).

However, the IDEA's exhaustion requirement "does not apply 'in situations in which

exhaustion would be futile.'"  *Coleman*, 503 F.3d at 205 (quoting *Polera*, 288 F.3d at 488).

"The party seeking to avoid exhaustion bears the burden of showing futility."  *Cave*, 514 F.3d at

249.  "To show futility, a plaintiff must demonstrate that 'adequate remedies are not reasonably

available' or that 'the wrongs alleged could not or would not have been corrected by resort to the administrative hearing process.'" *Coleman*, 503 F.3d at 204–05 (quoting *J.G. v. Bd. of Educ. of Rochester City Sch. Dist.*, 830 F.2d 444, 447 (2d Cir. 1987) and *Heldman v. Sobol*, 962 F.2d 148, 158 (2d Cir. 1992)).  "For relief to be adequate, it must 'give realistic protection to the claimed right.'"  *Id.* (quoting *Murphy*, 297 F.3d at 199).

The Second Circuit has found exhaustion excused on grounds of futility "where parents were not informed of administrative remedies, where the state agency was itself acting contrary to law, where the case involves 'systemic violations that could not be remedied by local or state administrative agencies,' or where 'an emergency situation exists (e.g., the failure to take immediate action will adversely affect a child's mental or physical health).'"  *Baldessarre*, 496 F. App'x at 134–35 (quoting *Cave*, 514 F.3d at 249, and *Coleman*, 503 F.3d at 206) (additional internal citations and quotation marks omitted).  The futility exception also applies in the narrow circumstances "in which a school has failed to implement services that were specified or otherwise clearly stated in an IEP."  *Polera*, 288 F.3d at 489.

## 2.    Application

Defendants argue that many claims in the AC must be dismissed for lack of subject matter jurisdiction because F.C. failed to exhaust administrative remedies.  Defendants first so argue as to claims regarding SYs after 2012–2013, whether brought under the IDEA or related statutes.  Def. Br. 8–9; Def. Reply Br. 2–4.[5]  Separately, defendants argue, as to the 2011–2012

---

[5] Defendants do not claim a failure of exhaustion with respect to F.C.'s claims that defendants (1) violated T.C.'s stay-put rights, and (2) failed to enforce the IHO's and SRO's administrative orders bearing on T.C.'s education.  As F.C. rightly notes, Pl. Br. 24–25, although some events underlying these alleged lapses occurred after the end of the 2012–2013 SY, a plaintiff is not required to exhaust claims of a violation of stay-put rights or of a failure to implement administrative orders.  *See Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 455 (2d Cir. 2015) ("'[A]n action alleging violation of the stay-put provision falls within one, if not more, of the enumerated exceptions to' the IDEA's exhaustion requirement." (quoting *Murphy*, 297 F.3d at

and 2012–2013 SYs, F.C., although exhausting IDEA claims, failed to exhaust her Section 504 claims for those SYs.  Def. Br. 11–12; Def. Reply Br. 5–6.  The Court addresses each in turn.

> ### a.    Violations of the IDEA for the SYs after the 2012–2013 SY

F.C. acknowledges that as to IEPs for SYs following 2012–2013, F.C. has not exhausted the administrative review process.  But, F.C. argues, exhaustion should be excused as futile because that review process is protracted and because defendants have admitted that T.C. has been denied a FAPE for four years (2011–2015).  Effectively, F.C. argues, the duration of the administrative review process, and the attendant backlogs and delays, means that the review of a proposed IEP will often not be complete before the relevant school year has ended.  And, F.C. argues, while a wealthy parent can avoid harm to the child by paying for a private school education and then seeking tuition reimbursement via a retrospective action under the IDEA, a child whose parent lacks financial means may be consigned to inadequate educational offerings while the lengthy administrative review process runs its course.  Pl. Br. 27–28.

F.C.'s predicament is undeniably sympathetic.  As of the November 23, 2015 filing of the AC, administrative proceedings were underway for the 2013–2014 and 2014–2015 SYs, and F.C. has represented that she intends file a due process complaint for the 2015–2016 SY.  But Congress in the IDEA put in place a mandatory administrative review process, including to

---

199)), *cert. denied*, 136 S. Ct. 2022 (2016), *reh'g denied*, No. 15-1159, 2016 WL 3865927 (U.S. July 18, 2016); *R.B. ex rel. L.B. v. Bd. Of Educ. of N.Y.C.*, 99 F. Supp. 2d 411 (S.D.N.Y. 2000) (plaintiff not required to further exhaust administrative remedies by appealing to SRO decision of IHO which granted plaintiff the relief sought, but which defendants had failed to enforce); *see also Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 117–18 (1st Cir. 2003) (parents not required to return to administrative process to obtain an order enforcing earlier administrative decision before bringing federal claim).  Although defendants' broad statement that the Court lacks jurisdiction over all claims relating to the period after the 2012–2013 SY might have been read to argue that the Court lacks jurisdiction over F.C.'s stay-put and non-enforcement claims, defendants have clarified that they do not so argue.  *See* Def. Reply Br. 10–11 (challenging adequacy of pleadings of stay-put and failure to enforce claims, not jurisdiction).

fashion the very types of relief F.C. seeks: "compensatory education and equitable relief to T.C. that places him in the position that he would have been in had he not suffered FAPE deprivations." AC ¶ 304. And requiring a parent's claims to be vetted administratively "allows for the exercise of discretion and educational expertise by state and local agencies, affords full exploration of technical educational issues, [and] furthers development of a complete factual record." *J.S.*, 386 F.3d at 112–13 (quoting *Polera*, 288 F.3d at 487) (internal quotation marks omitted).

To be sure, in certain circumstances, "lengthy delays in the administrative process may justify a finding that exhaustion would be futile or inadequate." *M.G. v. N.Y.C. Dep't of Educ.*, 15 F. Supp. 3d 296, 303 (S.D.N.Y. 2014) (citing, *inter alia*, *Frutiger v. Hamilton Cent. Sch. Dist.*, 928 F.2d 68, 74 (2d Cir. 1991)).[6] Where a plaintiff has shown that, due to administrative backlog or otherwise, an IHO or SRO has failed to timely issue a decision on a fully briefed due process complaint or appeal, a district court can assume jurisdiction. *See id.* at 303 & nn. 43–44, 305 (excusing exhaustion as futile and assuming jurisdiction where IHO failed to issue decision more than six months after case was fully briefed). Such a claim, however, has not been made here.

The Court therefore holds that—for all school years after 2012–2013—it lacks jurisdiction to review plaintiff's claims as to T.C.'s IEPs (or lack thereof), the denial of a FAPE, and the proper remedies for denial of a FAPE. The Court dismisses those claims without prejudice to F.C.'s ability (1) later to seek to have the Court assume jurisdiction over them upon

---

[6] "Under the applicable federal regulations, IHOs have forty-five days to issue a final decision, while SROs have thirty." *M.G.*, 15 F. Supp. 3d at 305 (citing 34 C.F.R. § 300.515 (2006)).

a proper showing of an unjustifiably delayed decision by the IHO or SRO, and/or (2) to challenge any administrative determinations as to T.C. following exhaustion.

> b.    *Systemic Claims*

In contrast to claims particular to a child's FAPE, claims asserting systemic violations under the IDEA and related statutes need not be exhausted administratively.  Here, the AC purports to challenge four such allegedly systematic practices: (1) requiring students with IEPs to miss standard instructional time in order to receive supportive related services, special education services, compensatory education and remediation; (2) restricting IEP teams' ability to recommend certain tutoring, research-based instruction, after-school services, and services for extracurricular and nonacademic activities; (3) decertifying students for services without a prior reevaluation; and (4) reducing, for children with IEPs, the criteria for promoting a child to the next grade level.  *See* Pl. Br. 25 (identifying first three as systemic claims); *id.* at 18 (identifying fourth as a policy in violation of Section 504).  F.C. alleges that each of these policies has harmed T.C.  F.C. seeks a declaratory judgment declaring these systemic policies illegal, and injunctive relief related to the first three.  AC ¶ 304.

As noted, the Second Circuit has excused exhaustion as futile "in cases involving systemic violations that could not be remedied by local or state administrative agencies 'because the framework and procedures for assessing and placing students in appropriate educational programs were at issue, or because the nature and volume of complaints were incapable of correction by the administrative hearing process.'"  *Cave*, 514 F.3d at 249 (quoting *J.S.*, 386 F.3d at 114).  Defendants argue that this principle applies *only* when systemic violations are alleged on behalf of a large group of disabled students, as opposed to a single individual alleging a violation of his rights on account of an unlawful systemic policy.  Def. Reply Br. 4.  But the Second Circuit has not so held.  Rather, it has excused exhaustion as futile in such circumstances

not exclusively because of the size of the plaintiff class or group, but because, where a systemic policy is at stake, the administrative officer "ha[s] no power to correct the violation." *J.S.*, 386 F.3d at 113.[7]  Exhaustion is also excused where "an agency has adopted a policy or pursued a practice of general applicability that is contrary to law." *Mrs. W.*, 832 F.2d at 756 (quoting H.R. Rep. No. 296, 99th Cong., 1st Sess. 7 (1985)); *see also M.G.*, 15 F. Supp. 3d at 303 (same).

Provided the facts pled adequately and not conclusorily allege systemic policies—a point to which the Court turns next—the violations described in F.C.'s AC are of the sort for which exhaustion has been excused.  F.C. alleges policies that are unlawful across-the-board, not merely as applied to her son.  Her first two claims challenge the nature and manner of the services that are offered to children with disabilities; her third and fourth challenge the processes by which such children are evaluated and placed.  As the AC describes them, these are "systemic policies which resulted in the failure to provide adequate services [such that] the administrative process . . . could not adequately remedy the problem" because "administrative hearing officers do not have the ability to alter already existing policies."  *S.W. by J.W. v. Warren*, 528 F. Supp. 2d 282, 293–94 (S.D.N.Y. 2007) (holding exhaustion futile where plaintiff alleged systemic violation that defendants "limited the amount, duration and availability of services," *id.* at 295–296); *see also  J.S.*, 386 F.3d at 115 (finding excused from exhaustion for claims of systemic "failure to perform timely evaluations and reevaluations of disabled children"); *M.G.*, 15 F.

---

[7] *J.S.* cited the following as examples of cases challenging systemic policies where administrative exhaustion was thereby excused: *Heldman v. Sobol*, 962 F.2d 148 (2d Cir. 1992), challenging the manner in which hearing officers were selected; *Mrs. W. v. Tirozzi*, 832 F.2d 748 (2d Cir. 1987), challenging the state's administrative scheme as deficient and seeking reform of complaint resolution procedures; *J.G. v. Board of Education of the Rochester City School District*, 830 F.2d 444 (2d Cir. 1987), challenging systemic failures to evaluate and place students, to develop IEPs, and to inform parents of their rights; and *Jose P. v. Ambach*, 669 F.2d 865 (2d Cir. 1982), seeking structural reform of state educational systems to allow more timely evaluation and placement of handicapped children.  386 F.3d at 113–114.

Supp. 3d at 304–05 (systemic claims that defendant "refuses to include certain services on any IEP regardless of the student's needs" need not be exhausted).

The Court therefore considers, as to each asserted systemic policy, whether the AC has plausibly pled *systemic* practices, as opposed to violations particular to T.C.  The AC must so plead for administrative exhaustion to be excused, because the plaintiff bears the burden of establishing futility.  *See Cave*, 514 F.3d at 249; *M.G.*, 15 F. Supp. 3d at 305 ("[P]laintiffs have *plausibly alleged* violations that the administrative process has 'no power to correct,' [therefore] exhaustion would be inadequate or futile." (quoting *J.S.*, 386 F.3d at 113) (emphasis added)).

i.   Causing students to miss core instruction

The AC has plausibly pled the existence of a policy whereby special education and related services, and compensatory education services, are to be provided during regular class time, causing children to miss core instruction without remediation.  It alleges that this practice harmed T.C. during the 2011–2012 SY and in 2014.  AC ¶¶ 96, 171–72; *see also id.* ¶ 238 (appealing IHO decision's provision of in-school compensatory education).  The AC non-conclusorily pleads that this was a matter of policy and practice.  Thus, the AC alleges that, in T.C.'s 2011 IEP, defendants, "based on [their] policies . . .  insisted in implementing any services on [T.C.'s] IEP by removing him from his underlying classes."  *Id.* ¶ 96; *see also id.* ¶¶ 171–72 ("Defendants insisted on trying to pull T.C. out of core subjects," and "refused" F.C.'s "request[s] that the services be provided after-school or in a fashion that did not require [T.C.] to miss class time."); IHD at 17 ("Parent believes her child should not be pulled out of class for speech therapy since he will miss something.  Parent would like therapy to be delivered after school.").  The AC further alleges that defendants "would not provide make-up services to instruct[] T.C. on what he missed when he was out of class."  *Id.* ¶ 96.

These pleadings allege facts that support a reasonable inference that F.C., having requested that defendants provide T.C. with support services outside of his main classes, or that T.C. receive make-up instruction, was met with a categorical refusal from defendants on account of their policies.  The allegation that these refusals recurred over a period of multiple school years provides a degree of confirmation that defendants have a systemic policy of not providing such support services other than during regular school hours and of not providing make-up instruction.  The Court therefore holds that exhaustion of this claim is excused.  The Court has jurisdiction over this claim.

ii.    Restrictions on services offered

The AC challenges various restrictions on services offered.  These include the failure to offer (1) AT, *id.* ¶¶ 88, 111; (2) 1:1 instruction or after-school tutoring, *id.* ¶¶ 61, 112–13; (3) services for extracurricular activities, *id.* ¶ 62; and (4) services for children with ADHD, *id.* ¶¶ 63, 207, 246–47.  *See also id.* ¶¶ 57–58 (alleging generally that defendants, while purporting to offer a "continuum or 'menu' of special education services," instead, in practice, offer only a "few-sizes-fits-most" approach (internal quotation marks omitted)).

Of these ostensible across-the-board policies, the only one that the A.C. has plausibly pled as systemic is that of not offering 1:1 instruction and after-school tutoring.  As to that policy, the AC alleges that during the 2012 IEP meeting, defendants' "staff told F.C. that they do not offer 1:1 instruction or after-school tutoring through an IEP."  *Id.* ¶ 113.  That allegation, which must be accepted as true on the present motion, supports the allegation of the existence of a policy or practice.

As to others, the A.C. makes only conclusory allegations of systemic reach.  With respect to AT, the AC states only that at the 2011 IEP meeting, a school psychologist indicated that "she had never recommended AT before," that neither she nor any of the other team members "were

familiar with AT," and that AT "was not available *at the school*." *Id.* ¶¶ 88, 111 (emphasis

added). And, the IHO found that T.C. *was* "provide[d] a degree of AT, albeit mostly low tech."

IHD, at 33; *but see id.* at 24 (F.C. testified that she "was told that they do not provide assistive

technology" (internal quotation marks omitted)). With respect to the provision of services to

support extracurricular activities, the AC pleads only in conclusory fashion that IEP teams

cannot recommend special education or related services for extra-curricular activities in IEPs.

AC ¶ 62. And with respect to services for children diagnosed with ADHD, the AC pleads that

T.C. was not provided services related to his ADHD diagnosis, and pleads conclusorily that

defendants do not have services or programs to address ADHD, but does not plead facts to

support an inference that this denial resulted from a broad policy or practice. *See id.* ¶¶ 63, 207,

246–47; *see also id.* ¶¶ 161, 241 (challenging IHO's decision not to award services related to

ADHD). These allegations therefore do not support the claim of a systemic violations, but

instead rather reflects a plaintiff-specific "dispute over the quality or methodology of service,

which is routinely and properly resolved through the administrative process." *S.W.*, 528 F. Supp.

2d at 296.

iii.   Decertification

The AC has plausibly pled that defendants, due to a policy or practice, decertify children

without first reevaluating them. The AC alleges that defendants decertified or declassified T.C.

for special education and related services in 2010, 2012, and 2014, AC ¶¶ 71, 102–08, 180, 193–

97, and did so without first conducting a proper reevaluation pursuant to policies and practices

rather than by oversight in T.C.'s particular case, *id.* ¶¶ 64–65, 194. The allegation of a broad

policy or practice to this effect is supported by the allegation that defendants have stated in

administrative proceedings that they are not required to conduct a reevaluation before

decertification. *Id.* ¶ 195.

iv.     Reduced promotional criteria

The AC does not plausibly allege a policy and practice of reducing promotional criteria for children with IEPs.  The only factual allegation pertaining to promotional criteria is that "the 2011 IEP reduced T.C.'s promotional standards, allowing him to be promoted by satisfying only 55% of the general education standards for that year."  *Id.* ¶ 97.  The AC's other allegations regarding promotional criteria do not permit the inference of a policy and practice.  *See id.* ¶¶ 210(*l*) (IEPs failed to contain accurate promotional criteria), 277 (defendants violated IDEA by "repeatedly and erroneously lowering T.C.'s promotional criteria").

\*\*\*

To summarize, the Court holds that the AC has plausibly pled that defendants committed systemic violations by requiring students to miss core instruction to receive support services, preventing IEP teams from recommending 1:1 instruction and after-school tutoring, and decertifying students without prior reevaluation.  The Court therefore has jurisdiction over those claims.  However, the AC has not plausibly pled systemic violations by virtue of policies that prevented IEP teams from recommending AT, providing services in support of extracurricular activities, or providing services to students with ADHD, or policies directing IEP teams to reduce promotional criteria for children with IEPs.  The Court therefore lacks jurisdiction over these claims to the extent that they pertain to years after the 2012–2013 SY.[8]  Such claims are dismissed without prejudice.

---

[8] The Court, of course, has jurisdiction over F.C.'s challenges to such practices to the extent they affected T.C. during the 2011–2012 and 2012–2013 school years, as to which the requirement of administrative exhaustion has been met.

       *c.*        *Section 504 Claims for the 2011–2012 and 2012–2013 SYs*

      Defendants next argue that the AC's § 504 claims for the 2011–2012 and 2012–2013 SYs must be dismissed for lack of jurisdiction because F.C. did not administratively exhaust those claims before the IHO and SRO.  Defendants argue that the Second Circuit's decision in *Polera* requires that, before bringing § 504 claims before a district court, a plaintiff must assert *the § 504 claims* in the administrative proceedings.  Def. Br. 11–12; Def. Reply Br. 5–6.  Plaintiff counters that administratively exhausting the IDEA claims is itself sufficient, and, in any event, she exhausted (or attempted to exhaust) her Section 504 claims.  Pl. Br. 30–31.

      Although exhaustion is generally not required for claims under § 504, *see Henchey v. Town of N. Greenbush*, 831 F. Supp. 960, 968 (N.D.N.Y. 1993) (collecting cases), the analysis is different where claims involve the education of children with disabilities.  The IDEA provides:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the [ADA], title V of the Rehabilitation Act of 1973 . . . , or other Federal laws protecting the rights of children with disabilities, *except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.*

*Polera*, 288 F.3d at 483 (quoting 20 U.S.C. § 1415(*l*)) (emphasis in *Polera*).  In *Polera*, the child's parent eschewed the administrative process altogether, and filed a lawsuit which brought claims not under the IDEA, but under other statutes, including Section 504.  The Second Circuit held that Polera had been obliged to administratively exhaust her remedies.  It explained that the IDEA "provides that potential plaintiffs with grievances related to the education of disabled children generally must exhaust their administrative remedies before filing suit in federal court, even if their claims are formulated under a statute other than the IDEA (such as the ADA or the Rehabilitation Act)."  *Id.* at 481.  To be sure, the Circuit noted, in seeking monetary damages, Polera was not seeking "relief that is also available" under the IDEA, because monetary damages

are not available under the IDEA. *Id.* at 486. But, the Circuit held, given the substance of her theory of liability, Polera was nonetheless required to exhaust the administrative remedies provided by the IDEA:

> The IDEA is intended to remedy precisely the sort of claim made by Polera: that a school district failed to provide her with appropriate educational services. . . . Where, as here, a full remedy is available at the time of injury, a disabled student claiming deficiencies in his or her education *may not ignore the administrative process* . . . .

*Id.* at 488 (emphasis added); *see also J.S.*, 386 F.3d at 112 ("As the district court correctly noted, the students asserted a section 504 Rehabilitation Act claim and a section 1983 claim that both seek to ensure a free appropriate public education, thus subjecting both to *the IDEA exhaustion requirement*." (emphasis added)) (holding, where plaintiffs did not undergo any administrative exhaustion of IDEA or other claims, unexhausted claims excused as futile for alleging systemic violations).

*Polera* and *J.S.* make clear that a plaintiff asserting education-related claims under statutes other than the IDEA cannot avoid administrative exhaustion altogether. They do not expressly hold, however, that the would-be plaintiff must assert the non-IDEA claims in that process. "The IDEA's exhaustion requirement was intended to channel disputes related to the education of disabled children into *an administrative process* that could apply administrators' expertise in the area and promptly resolve grievances." *Polera*, 288 F.3d at 487 (emphasis added). With the IHO and SRO's having evaluated all IDEA claims by such a plaintiff, a court would appear already to have the benefit of those officers' relevant educational expertise. With the IHO's and SRO's resolution of the IDEA claims in hand, it is not clear that these officers would have additional expertise to bring to bear on other statutory claims (*e.g.*, under an anti-discrimination statute such as § 504), or that the IHO's or SRO's resolutions of non-IDEA claims would merit judicial deference.

Nevertheless, several district courts in this Circuit have held that they lack jurisdiction over § 504 claims where the plaintiff pursued administrative remedies for IDEA claims but failed specifically to assert § 504 claims during the administrative process. *See John M. v. Brentwood Union Free Sch. Dist.*, No. 11 Civ. 3634 (PKC), 2015 WL 5695648, at *12–13 (E.D.N.Y. Sept. 28, 2015); *M.A. v. N.Y. Dep't of Educ.*, 1 F. Supp. 3d 125, 144 (S.D.N.Y. 2014) (adopting report and recommendation); *P. v. Greenwich Bd. of Educ.*, 929 F. Supp. 2d 40, 50–51 (D. Conn. 2013).[9]

The Court ultimately has no occasion to resolve this issue here. Even assuming that exhaustion of the § 504 claims specifically was required, F.C. satisfied that requirement by raising the claims in the administrative process before the IHO. F.C.'s June 25, 2013 amended DPC asserts that defendant violated both the IDEA and § 504. Hyman Decl., Ex. A, at 1, 13. Thus, this is not a case in which plaintiff "did not present the Hearing Officer with a claim of discrimination in violation of Section 504." *P. v. Greenwich Bd. of Educ.*, 929 F. Supp. 2d at 50. For reasons unknown, the IHO did not address the § 504 claims. And although F.C.'s appeal to the SRO did not invoke the § 504 claims, doing so would have been futile because state law does not give the SRO jurisdiction over § 504 claims. *See A.M. ex rel. J.M. v. N.Y.C. Dep't of Educ.*, 840 F. Supp. 2d 660, 672 n.17 (E.D.N.Y. 2012) ("Under New York State education law, the SRO's jurisdiction is limited to matters arising under the IDEA or its state counterpart." (citing 89 N.Y. Educ. L. 4404(2)), *aff'd sub nom. Moody ex rel. J.M. v. N.Y.C. Dep't of Educ.*, 513 F. App'x 95 (2d Cir. 2013) (summary order); *see also Mark H. v. Lemahieu*, 513 F.3d 922, 927 n.3,

_____

[9] *Mark H. v. Lemahieu*, 513 F.3d 922 (9th Cir. 2008), on which plaintiff relies, does not hold to the contrary. Rather, the Ninth Circuit stated that "[b]ecause the § 504 FAPE requirement differs from the IDEA FAPE requirement, it is not clear how the exhaustion provision of § 1415(*l*) applies to suits for damages for failure to provide a § 504 FAPE," but declined to reach the issue. *Id.* at 935 n.11.

935 n.11 (9th Cir. 2008) (plaintiff "did exhaust the IDEA administrative remedies" by raising IDEA and § 504 claims before the IHO, even though IHO only addressed the IDEA violations); *C.D. v. N.Y.C. Dep't of Educ.*, No. 05 Civ. 7945 (SHS), 2009 WL 400382, at *3 (S.D.N.Y. Feb. 11, 2009) (SRO twice asserted that it had no jurisdiction under § 504 in appeals from IHO decisions in which § 504 claims were raised).

Therefore, the Court holds, it has jurisdiction over plaintiff's § 504 claims for the 2011–2012 and 2012–2013 SYs.

### C.   Mootness

Defendants conceded that they failed to offer T.C. a FAPE, both for the two school years that were the subject of the administrative proceedings (2011–2012 and 2012–2013), and for the ensuing two SYs (2013–2014 and 2014–2015). Def. Br. 1, 13 n.8. Defendants argue that, given this concession as to liability, plaintiff's IDEA claims for those years are moot, as there is no live case or controversy. Def. Br. 13; Def. Reply Br. 10. Defendants are wrong.

"The mootness doctrine is derived from Article III of the Constitution, which provides that federal courts may decide only live cases or controversies." *Van Wie v. Pataki*, 267 F.3d 109, 113 (2d Cir. 2001). "A case becomes moot when interim relief or events have eradicated the effects of the defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur." *Irish Lesbian and Gay Org. v. Giuliani*, 143 F.3d 638, 647 (2d Cir. 1998).

Defendants' concession of liability for failure to provide a FAPE during those years does not moot this case. First, F.C. brings claims seeking declaratory and injunctive relief regarding various DOE policies and practices reviewed above. Resolution of those claims may affect whether F.C. receives a FAPE in future years. *See* AC ¶ 304. Moreover, there is the matter of

relief.  F.C. here seeks injunctive relief, which has not yet been awarded, to help remediate T.C. for defendants' conceded violations (and to assure against future ones).

F.C.'s claims under the IDEA are not moot.  The Court has jurisdiction over them.[10]

**D.      Failure to State a Claim**

**1.      Claims Related to the IHO and SRO Proceedings**

*a.      Stay-Put (or Pendency) Claims*

Defendants argue that the AC does not state a claim to the extent it alleges violations of T.C.'s stay-put, or pendency, rights.  Def. Br. 14 n.10; Def. Reply Br. 10.  The Court rejects that argument.

"The stay-put provision of the IDEA provides that 'during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child.'"  *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 452 (2d Cir. 2015) (quoting 20 U.S.C. § 1415(j)), *cert. denied*, 136 S. Ct. 2022 (2016), *reh'g denied*, No. 15-1159, 2016 WL 3865927 (U.S. July 18, 2016.  "If the child is ejected from his or her current educational placement while the administrative process sorts out where the proper interim placement should be, then the deprivation is complete."  *Murphy*, 297 F.3d at 199.

The AC alleges that defendants violated T.C.'s stay-put rights when, after the IHO issued its decision in March 2014 and while the appeal to the SRO was pending, defendants decertified T.C. at the May 2014 IEP meeting.  *See* AC ¶¶ 180–81.  The AC further alleges that, after F.C. filed a second due process complaint (which was amended in March 2015), defendants failed to

---

[10] Defendants separately argue that F.C.'s claims under state education laws and regulations "are redundant" of her IDEA claims and thus are equally moot.  Def. Br. 13.  For the same reasons as above, these claims are not moot.

reinstate T.C., notwithstanding his eligibility for services, at least due to his pendency rights.  *Id.* ¶¶ 193, 203; *see also id.* ¶¶ 251–57 (allegations concerning "pendency" and the delivery of services to T.C. based on his last agreed upon placement as of the 2012–2013 SY).[11]

These allegations state a claim for violations of T.C.'s pendency rights, and the A.C. expressly seeks relief for such violations.  *Id.* ¶ 304(c) (seeking "compensatory education and relief for the ensuing years in which . . . pendency rights [were] violated").  The Court therefore denies the motion to dismiss these claims.

> b.   *Violations of the IHD and SRO Decision*

Defendants argue that the AC does not state a claim that defendants failed to implement the relief awarded by the IHD and SRO.  Def. Reply 11.  The AC alleges that defendants "failed to implement the relief awarded by the SRO," AC ¶ 5, and that defendants failed to consider for future IEPs the recommendations of various reports and evaluations that had been conducted as instructed by the IHO and SRO, *id.* ¶¶ 169, 187, 223.  Defendants claim the recommendations by the IHO and SRO were non-binding dicta.

The Court declines, in its discretion, to consider this ground for dismissal, because defendants first raised this argument in their reply brief.  *See Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 375 (S.D.N.Y. 2009) ("[A] district court is free to disregard [an] argument raised for the first time in reply papers . . . ."), *aff'd*, 374 F. App'x 71 (2d Cir. 2010) (summary order).  In her opposition brief, F.C. had responded to defendants' claim of a failure of administrative exhaustion, but was not on notice that defendants believed these claims to be deficient for this separate reason.  Pl. Br. 25.  Defendants' motion to dismiss

---

[11] The Court understands the AC to assert violations of T.C.'s pendency rights as a result of both administrative proceedings.

this claim is therefore denied.  This ruling is without prejudice to defendants' right to challenge

this claim on the same grounds later in these proceedings (*e.g.*, on summary judgment).

### c.   SRO Qualifications

Separately, the AC challenges the SRO's qualifications.  *See* AC ¶¶ 185–88, 258–61

(alleging lack of qualification).  Like defendants, the Court does not understand these factual

allegations to reflect an independent legal claim.  Def. Br. 14 n.10.  Instead, as alleged, the

SRO's qualifications bear on the deference due to the SRO's decision on appeal.

### 2.   Section 504

Defendants argue that plaintiff has failed to sufficiently plead a violation of § 504.

Section 504 provides:

> No otherwise qualified individual with a disability in the United States, . . . shall,
> solely by reason of her or his disability, be excluded from the participation in, be
> denied the benefits of, or be subjected to discrimination under any program or
> activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a).  "A prima facie violation of Section 504 requires proof from the plaintiff that

'(1) he is a "[disabled] person" under the Rehabilitation Act; (2) he is "otherwise qualified" for

the program; (3) he is excluded from benefits solely because of his [disability]; and (4) the

program or special service receives federal funding.'"  *C.L. v. Scarsdale Union Free Sch. Dist.*,

744 F.3d 826, 840–41 (2d Cir. 2014) (alterations in original) (quoting *Mrs. C. v. Wheaton*, 916

F.2d 69, 74 (2d Cir. 1990)).

To state a claim for a violation of § 504, "the plaintiff must demonstrate intentional

discrimination.  'Something more than a mere violation of the IDEA is necessary in order to

show a violation of Section 504 in the context of educating children with disabilities.'"  *Butler v.*

*S. Glens Falls Cent. Sch. Dist.*, 106 F. Supp. 2d 414, 420 (N.D.N.Y. 2000) (quoting *Wenger v.*

*Canastota Cent. Sch. Dist.*, 979 F. Supp. 147, 152 (N.D.N.Y. 1997), *aff'd*, 181 F.3d 84 (2d Cir.

1999), and 208 F.3d 204 (2d Cir. 2000) (summary order)) (internal citation omitted).  However, a "plaintiff is not required to show 'personal animosity or ill will.  Rather, intentional discrimination may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy or custom.'"  *Id.* at 420 (quoting *Bartlett v. N.Y. Bd. of Law Examiners*, 156 F.3d 321, 331 (2d Cir. 1998), *judgment vacated on other grounds*, 527 U.S. 1031 (1999)).  A § 504 violation "may be predicated on the claim that a disabled student was denied access to a free appropriate education, as compared to the free appropriate education non-disabled students receive," where defendants are shown to have "acted with bad faith or gross misjudgment."  *C.L.*, 744 F.3d at 841 (internal quotation marks and citations omitted).

The A.C. alleges violations of § 504 primarily based on various systemic policies and practices of defendants.  The Court has previously found adequate the AC's pleadings of certain systemic practices: specifically, regarding the scheduling of services during core instructional time, restrictions on 1:1 instruction and after-school tutoring in IEPs, and decertifying students without prior reevaluation.  The Court therefore considers whether the AC states a § 504 claim regarding these practices.  The Court then considers the AC's claims that defendants violated § 504 during the 2011–2012 and 2012–2013 SYs, including by, with bad faith or gross misjudgment, denying T.C. a FAPE.

### a.    *Missing Core Instructional Time*

The AC alleges that defendants' policy requiring students to miss core instructional classes to receive support services, without being provided additional opportunities to make up the instruction missed, as applied to T.C., violated § 504.  A.C. ¶ 287; Pl. Br. 15–17.  By requiring T.C. to receive services during regular school instruction time, the AC alleges, T.C. was denied benefits that he would have received if he were not disabled.  Specifically, F.C.

27

explains, as a child in New York City, T.C. is entitled to receive a free public general and special

education until the year he turns 21 or receives a regular high school diploma, whichever comes

first; a full-time educational program for a regular education student is 180 days, with a

mandatory five hours per day for elementary students and five and a half hours per day for

secondary school students.  Pl. Br. 16 (citing N.Y. Educ. Law § 3202(1) and 8 N.Y.C.R.R.

§ 175.5).  New York State also requires students to receive a certain number of instructional

hours for particular topics.  *Id.*  Thus, F.C. argues, the policy under which T.C. was removed

from instructional classes to receive special education, related, and compensatory services

deprives him of educational benefits to which his non-disabled peers are entitled, and which T.C.

himself would receive but for his disability.  *Id.* at 16–17.

Defendants argue that, on the AC's allegations, T.C. was removed from core classes not

because of a motivation to discriminate against him on the basis of his disability, but rather "for

administrative convenience."  Def. Reply 7 (quoting AC ¶¶ 60, 171, 252).  That argument does

not support dismissal.  The AC articulates a viable theory that defendants' policies of forcing

disabled students to forego instructional hours disparately burdened disabled students like T.C.

and reflected a failure to reasonably accommodate such students.

Judge Stein's decision in *C.D. v. New York City Department of Education* is instructive.

In *C.D.*, three minor students with learning disabilities had been placed in a private school (at

public expense) because their public school placements could not provide them with a FAPE.

2009 WL 400382, at *1.  Upon being placed in a private school, however, the students were no

longer provided with free breakfasts and lunches, which they had been provided at the public

schools as a result of their financial need.  *Id.*  Although defendants had a facially neutral policy

under which private school students were categorically ineligible for the free breakfast and lunch

28

program, Judge Stein held the plaintiff had sufficiently pled claims under § 504 (and the ADA) for denial of such benefits on account of disabilities, based on theories of disparate impact and failure to provide reasonable accommodations.  *Id.* at *11–13.

That logic applies here.  Based on the allegations in the AC, but for the fact that he is receiving special education and related services during the regular instructional time pursuant to an alleged policy of defendants, T.C. would receive more regular classroom instruction—the amount which able students receive and to which all students are entitled under New York State and New York City law and regulations.

Therefore, the AC adequately alleges a violation of § 504 resulting from defendants' policy that support services be provided during regular class instruction.

> b.       *Restrictions on 1:1 Instruction*

The AC alleges that defendants violated § 504 by adopting policies restricting the types of services that can be offered in an IEP to a student with a disability, which includes the policy of restricting 1:1 instruction.  AC ¶ 288; Pl. Br. 14–15.  This claim presents a close question.

On the one hand, the AC does not convincingly allege how such a policy or practice "exclude[s T.C.] from benefits solely because of his [disability]."  *C.L.*, 744 F.3d at 840–41 (second alteration in original) (citation omitted).  Unlike the situation present in *C.D.*, where children were being denied benefits (free meals) that they otherwise would have received, the AC does not allege that T.C. has been deprived of services he would have received but for his disability.  The AC instead claims that T.C. should have been given *additional* services in the form of 1:1 instruction.  The cases on which plaintiff relies do not establish that this circumstance states a claim under § 504.  *See M.G. v. N.Y.C. Dep't of Educ.*, 15 F. Supp. 3d 296, 304–305 (S.D.N.Y. 2014) (while holding that plaintiff had "plausibly alleged [systemic] violations that the administrative process has 'no power to correct,'" thereby excusing

exhaustion, not analyzing whether plaintiff had stated a claim under § 504); *see also Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840 (2004) (discussing blanket policy of failing to provide a certain type of service to children with autism under the IDEA but not § 504).

On the other hand, the AC can be read to assert that, by not providing these services to disabled students as a matter of policy—*i.e.*, not reasonably accommodating their disabilities— defendants are disparately treating disabled students in their pursuit of a general education.  AC ¶ 292.  And, as the Court has held, the AC has adequately alleged that this restriction on services is a matter of policy or practice.

At this early stage of the litigation, with the 1:1 policy already falling within the scope of this case based on the AC's other claims, the Court will sustain it over defendants' motion to dismiss.  Although the question is a close one, defendants' policy, as alleged, plausibly can be said to bespeak "deliberate indifference to the strong likelihood that a violation of a federally protected right will result," *Bartlett*, 156 F.3d at 331 (citation omitted), namely, that, denied such services, T.C. would be denied a FAPE under the IDEA due to an insufficient IEP.  The Court therefore denies the motion to dismiss.

### c.   Decertification

The AC alleges that defendants have a policy and practice of declassifying children with IEPs, and that terminating special education services without prior reevaluation violates § 504. AC ¶¶ 64–65, 194; Pl. Br. 18.  Plaintiff argues that this policy violates 34 C.F.R. § 104.35(a), a regulation implementing § 504, which requires that public elementary and secondary programs "shall conduct an evaluation . . . of any person who, because of handicap, needs or is believed to need special education or related services before . . . any [] significant change in placement."  Pl. Br. 18; *see also id.* (noting that such a policy also violates the IDEA and related regulations) (citing 20 U.S.C. § 1414(c)(5) and 34 C.F.R. § 300.305).  Particularly given the claim that this

policy violates a federal regulation, the AC fairly alleges deliberate indifference on defendants'
part to a likely violation of the affected students' rights.  This allegation also states a § 504 claim.

>               d.        *Non-Policy Based Violations*

The AC also alleges violations of § 504 based on restrictions on other services offered by
IEP teams, including restrictions on AT, support services for extracurricular activities, and
failure to provide services for children with ADHD.  AC ¶¶ 288–89; Pl. Br. 14–15, 17–18.  The
Court has held that the AC does not plausibly allege that these actions reflect a policy of
defendants.  The Court therefore considers whether the AC alleges that, as acts directed to T.C.
during the 2011–2012 and 2012–2013 SYs, these violated § 504.

The Court holds that the AC does not allege sufficient facts to adequately plead that the
failure to offer the specified services to T.C. during these SYs amounted to discrimination
because of his disability.  The AC alleges only that these services were denied to T.C., without
any context indicative of discrimination based on disability.[12]  There are no allegations that non-
disabled students received such services, or of circumstances indicating that these services were
withheld so as to bespeak discrimination against those with disabilities.  The mere non-provision
of these services to T.C. does not support an inference of discrimination.

The AC also challenges under § 504 defendants' reduction of T.C.'s promotional criteria
for the 2011 IEP.  AC ¶ 286.  For that IEP, T.C.'s promotional criteria were reduced to 55% of

---

[12] As to restrictions on AT services, the AC alleges only that IEP team members were not
familiar with AT and that it was not offered at T.C.'s school.  AC ¶¶ 88, 111.  As to the services
for children with ADHD, the AC does not allege that services were not available to T.C. *because*
of his ADHD, but rather only that defendants did not provide services that F.C. had sought for
treating that condition.  *Id.* ¶¶ 63, 207, 246–47 (conclusory assertions that no services offered for
children with ADHD); *see also id.* ¶ 161 (IHO did not order services for T.C.'s ADHD).  Finally,
as to the denial of support services for extracurricular activities, there is only a single conclusory
allegation that such services were not offered to T.C., with no factual context indicative of
discriminatory intent.  *Id.* ¶ 62.

the general education criteria. *Id.* ¶ 97. This also falls short of stating a § 504 claim. The AC leaves unclear why the relaxation of these criteria as to T.C. denied him a benefit available to others because of his disability. Nor does it claim facts indicative of discriminatory intent with respect to this practice. The reduction in promotion criteria, by itself, does not state a § 504 claim.

       *e.*     *Denial of a FAPE*

The AC also alleges that defendants violated § 504 by denying T.C. a FAPE. *Id.* ¶¶ 290–91. Insofar as the Court has jurisdiction only over claims regarding the 2011–2012 and 2012–2013 SYs (and systemic claims), the Court considers this claim solely in relation to those years.

As noted, a § 504 violation based on the denial of a FAPE requires that the defendants acted with "bad faith or gross misjudgment." *C.L.*, 744 F.3d at 841. The AC alleges that defendants' conduct was "gross, egregious, intentional and reckless," AC ¶ 291, and recites various facts concerning the 2011–2012 and 2012–2013 SYs that support this allegation. These include defendants' failure to provide T.C. with a FAPE over a series of years, *id.* ¶ 156, their decertification of T.C. for all services except OT in 2012 without a proper prior reevaluation, *id.* ¶¶ 102–108, their failure to provide F.C. with evaluations of T.C. before IEP meetings, *id.* ¶¶ 78 (2011), 109 (2012), their failure to draft the IEP at the IEP meetings to allow F.C. to have input, *id.* ¶¶ 89 (2011), 114 (2012), and their failure to implement the 2011 IEP—providing T.C. with the specified SLT beginning only in November 2011 and failing to provide T.C. with the specified OT during that entire year, *id.* ¶ 101.

These allegations suffice to plead bad faith or gross misjudgment. *See R.B. ex rel. L.B. v. Bd. of Educ. of N.Y.C.*, 99 F. Supp. 2d 411, 419 (S.D.N.Y. 2000) ("Plaintiff has alleged sufficient facts to support her allegations of bad faith and gross misjudgment, including defendants' failure to take any action to implement" the IEP); *Butler*, 106 F. Supp. 2d at 421 (defendants denied

summary judgment where plaintiff presented evidence that school officials "developed several IEP's [sic] that were determined to be inappropriate for his educational needs, and failed to provide him with certain special education services").

Therefore, the AC states a claim under § 504 that defendants failed to provide T.C. with a FAPE and violated the IDEA and did so in bad faith or with gross misjudgment.

\*\*\*

In sum, the Court finds that the AC states a claim for violations of § 504 as a result of defendants' alleged policies requiring children to miss core instruction to receive support services, restriction on offering 1:1 instruction, and decertification without reevaluation, and for the denial to T.C. of a FAPE for the 2011–2012 and 2012–2013 SYs.  It does not state such a claim based on the alleged failure to offer various support services during the 2011–2012 and 2012–2013 SYs (AT, extracurricular services, and services related to ADHD), or based on reducing T.C.'s promotional criteria in his 2011 IEP.

### 3.    Section 1983

The AC also brings claims under 42 U.S.C. § 1983.  There are three categories of such claims: based on (1) violations of the IDEA and § 504, AC ¶¶ 296–98; (2) deprivation of T.C.'s property interests in education in violation of the Fourteenth Amendment of the U.S. Constitution; and (3) a violation of the Equal Protection Clause of the Fourteenth Amendment.

#### a.    Legal Standards

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."  *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress.

42 U.S.C. § 1983.  Thus, "[t]o state a claim for relief under Section 1983, a plaintiff must allege: (1) the deprivation of any rights, privileges or immunities secured by the Constitution and federal law, (2) by a person acting under the color of state law." *Scaggs v. N.Y.  Dep't of Educ.*, No. 06 Civ. 0799 (JFB), 2007 WL 1456221, at *12 (E.D.N.Y. May 16, 2007).

"[T]o hold a city liable under § 1983 for the [illegal] actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a [federal] right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)) (internal quotation marks omitted); *see generally Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658 (1978).

There are four ways to establish the existence of an official policy or custom, the first element of a *Monell* claim.  A plaintiff may plead that the constitutional violation was caused by:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted); *see also Spears v. City of New York*, No. 10 Civ. 3461 (JG), 2012 WL 4793541, at *11 (E.D.N.Y. Oct. 9, 2012).

b.      *IDEA and Section 504*

Plaintiff alleges that defendants violated § 1983 by violating the IDEA and § 504 in the various manners reviewed above, and that defendants did so as a result of adopting unlawful (and failing to adopt lawful) policies, procedures, and customs, and based on the failure to supervise and train employees.  AC ¶¶ 296–98.[13]  Defendants challenge these statutory § 1983 claims on the grounds that the AC does not adequately allege a policy or practice, or failure to train, sufficient to support a *Monell* claim.  Def. Br. 9–10; Def. Reply Br. 8–9.

The Court has already held that certain of defendants' conduct has adequately been pled to reflect systemic policies or practices.  To the extent the Court has so held, the AC adequately pleads policies and practices within the scope of § 1983.  To the extent the Court has held that these practices, as alleged, violated § 504, the AC states viable § 1983 claims.  In addition, the Court holds that plaintiff has adequately alleged that T.C. was injured by defendants' violations of the IDEA through these policies and practices.  *See, e.g.*, AC ¶¶ 35 (decertification), 26, 46, 96 (missing instructional time), 112–13 (1:1 instruction).[14]

In their reply brief, defendants, for the first time, asserted that plaintiff's § 1983 claims should be dismissed because they duplicate her claims for relief under the IDEA and § 504.  Def. Reply Br. 8.  Because defendants did not timely so argue, the Court declines to consider this argument at this time.  Defendants are at liberty to argue, at summary judgment, that the § 1983 claims should be dismissed as duplicative.

---

[13] The AC also appears to allege § 1983 claims on the basis of violations of New York state law. AC ¶ 298.  However, "a violation of state law is not cognizable under § 1983." *Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985).  To the extent that AC bases the § 1983 claim on state law violations, the Court dismisses them.

[14] Defendants are correct, however, that the AC does not allege any facts—only conclusory assertions—to support a § 1983 violation on the basis of a failure to train.  *See* AC ¶¶ 65, 282, 298.  To the extent they are based on such a theory, the AC's § 1983 claims fail to state a claim.

Defendants' motion to dismiss plaintiff's § 1983 claims based on violations of the IDEA and § 504 is therefore denied as to claims based on defendants' alleged policies and practices, but granted as to claims predicated on a failure to train.

c.   *Deprivation of a Property Interest*

The AC also brings a claim under § 1983 for defendants' alleged deprivation of T.C.'s property interest in education.  F.C. argues that T.C. has a "state-created right to public general and special education under New York law, as well as a right in the issuance of a high school diploma."  Pl. Br. 19–20.

The AC fails, however, to allege a necessary component of this claim, namely, that T.C. was deprived of this property interest *without due process of law*.  *See BD v. DeBuono*, 130 F. Supp. 2d 401, 430–31 (S.D.N.Y. 2000) (citing *Am. Mfrs. Mutual Ins. Co. v. Sullivan*, 526 U.S. 40 (1999), and *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)).  Such a "procedural due process violation is established if plaintiff shows that he or she was deprived of a meaningful opportunity to be heard with respect to the claim in issue."  *Id.* at 432.  The AC here does not allege that F.C. was denied a meaningful opportunity to be heard in the IHO and SRO proceedings with respect to the 2011–2012 and 2012–2013 SYs.  Quite the contrary, the AC's allegations support that these administrative proceedings not only heard, but substantially validated, F.C.'s claims.  F.C. was "not prevented from seeking due process for [her] claims" through the administrative hearings.  *S.W.*, 528 F. Supp. 2d at 298 (holding no due process violation even where resort to the administrative proceeding would have been futile).

Defendants' motion to dismiss the AC's § 1983 claim for the deprivation of a property interest in education is therefore granted.

d.      *Equal Protection Clause*

The AC next alleges that defendants violated T.C.'s rights under the Equal Protection

Clause of the Fourteenth Amendment.[15]  That claim focuses exclusively on the scheduling of the

related services for T.C. during core instructional time.  AC ¶ 301.

"In order to succeed in an equal protection claim, [F.C.] must demonstrate that [T.C.] was

treated differently than other [children] 'as a result of intentional or purposeful discrimination.'

. . .  Moreover, because disabled persons . . . are not a protected class, [F.C.] 'must also show that

this disparate treatment was not reasonably related to any legitimate government interest.'"

*Nelson v. City of New York*, No. 11 Civ. 2732 (JPO), 2013 WL 4437224, at *14 (S.D.N.Y. Aug.

19, 2013) (quoting *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005), and *Graham v.*

*Watertown City Sch. Dist.*, No. 10 Civ. 756, 2011 WL 1344149, at *5 (N.D.N.Y. Apr. 8, 2011)).

F.C. argues that T.C. was treated differently from other students because T.C. was

required to miss instructional time so as to receive assistive services whereas able students who

miss classes, for example due to disciplinary infractions, are required by state laws and

regulations to make up the missed instruction.  F.C. argues that there is no rational basis for that

distinction, that it furthers no legitimate government interest, and on the contrary results in the

contravention of law (*e.g.*, the IDEA).  Pl. Br. 21–22.

The AC falls short of stating an Equal Protection claim.  The scenarios that it contrasts—

the treatment of disciplinary infractions and the scheduling of assistive services for disabled

students—are apples and oranges.  And, as defendants note, the AC itself reflects a rational basis

for these policies.  As the AC alleges, T.C. was given related services during regular classes

during the school day for "administrative convenience" and "scheduling and administrative

---

[15] Although the AC includes her claim under the Equal Protection Clause as a separate Count,
AC ¶¶ 300–01, such a claim is properly brought under § 1983.

purposes." AC ¶¶ 60, 171, 252. As the Supreme Court has emphasized, "'adverse, disparate treatment' often does not amount to a constitutional violation where rational-basis scrutiny applies." *Bd. of Trs. of Univ. of Alabama v. Garrett*, 531 U.S. 356, 370 (2001). And it does not here. Whether or not the circumstances under which defendants offered assistive services to T.C. resulted in violations of T.C.'s statutory rights, on the facts pled, they did not deprive him of equal protection.

Therefore, defendants' motion to dismiss the AC's equal protection claim is granted.[16]

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss in part the Amended Complaint is granted in part and denied in part. To summarize, the Court:

- Dismisses, without prejudice, all of plaintiff's claims as they relate to the SYs after 2012–2013 for lack of subject matter jurisdiction, except for plaintiff's claims of systemic violations concerning the scheduling of support services, defendants' restriction on 1:1 instruction and after-school tutoring, and defendants' decertification of children without prior reevaluation.

- Denies the motion to dismiss plaintiff's Section 504 claims concerning the scheduling of support services, the restriction on 1:1 instruction and after-school tutoring, defendants' decertification of children without prior evaluation, and denial of a FAPE for the 2011–2012 and 2012–2013 SYs, and grants the motion to dismiss all other Section 504 claims.

- Denies the motion to dismiss plaintiff's IDEA claims and New York state law claims as moot, meaning that all of plaintiff's IDEA claims survive insofar as they pertain to the three systemic violations listed above as excused from exhaustion and all non-systemic violations to the extent they occurred during the 2011–2012 and 2012–2013 SYs.

- Denies the motion to dismiss plaintiff's claims for violations of T.C.'s pendency rights and defendants' failure to implement the relief awarded by the IHD and SRO decision.

---

[16] Defendants also, in a single, cursory and conclusory sentence, argue that plaintiff's New York State Constitution claim is "not sufficiently pleaded, is invalid, and must also be dismissed." Def. Br. 13. The AC alleges the defendants' actions violated Article XI, § 1 of the New York State Constitution. *See* AC ¶¶ 1, 43, 303. Because defendants do not explain the deficiencies with plaintiff's pleadings, the Court will not dismiss the claim.

- Denies the motion to dismiss plaintiff's § 1983 claims based on all systemic violations of the IDEA and Section 504 on the basis of defendants' alleged policies and practices, but grants the motion as to claims predicated on a failure to train.

- Grants the motion and dismisses plaintiff's § 1983 claims based on due process and equal protection violations under the U.S. Constitution.

- Denies the motion to dismiss plaintiff's New York State Constitution claim.

The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 12 and 25. The Court will promptly issue a separate order to address next steps in this litigation.

SO ORDERED.

_Paul A. Engelmayer_

Paul A. Engelmayer
United States District Judge

Dated: August 5, 2016
      New York, New York